The next case for argument is 21-1948 Eastern Missouri A.I.G. Agency v. American International Group. Mr. Simon? Good morning. May it please the court, I represent A.I.G. Agency in this case. I'm going to refer to them as plaintiff for my client for ease of reference since both companies go by A.I.G. I apologize in advance for the poor lighting. I brought some lamps in and done what I can, but I'm an internal conference room, so it's a little bit dark. Your Honor, if the following facts were found in this case, any defense of latches should be denied as a matter of law. The plaintiff had superior rights in the mark, at least in St. Louis and St. Charles. The defendant used the A.I.G. mark selling insurance through brokers, but not in direct marketing to consumers, not in direct competition with my client. The defendant stopped using A.I.G. mark in any direct-to-consumer advertising and direct-sale sales for three years and sold off those business units. Stopped using A.I.G. After the three years, the defendant started using the A.I.G. mark again, but this time they changed their marketing strategy. They were doing direct mail to consumers. We understand the nature of the claim. Let me get to what I consider the crux of this. Your client only has common-law trademark rights, correct? Absolutely correct. And you're seeking a nationwide, if not a worldwide, injunction as to use of the A.I.G. mark? That's not correct, Your Honor. I know the defendant already said- Wasn't that the prayer of relief? Stop using the A.I.G. mark? In the areas where my client has rights, because there was a dispute whether it was Missouri and Illinois and Florida, or just Missouri and Illinois, or just St. Louis and St. Charles County. In your view, the claim pled was consistent with what's called the T. Rose Rectanus Doctrine? I'm not familiar with that particular doctrine, but the claim, what we were seeking, Judge, is that just- The T. Rose Rectanus Doctrine denied a common-law trademark owner the right to protection in a remote geographic area. I agree with that. We are not seeking it outside our geographic area. Yes, we were seeking a limited injunction, and that was the reason for the delay in filing suit. My client didn't really compete with A.I.G. The district court found that my client competed with A.I.G., but the facts of record showed that they didn't really compete. Just because two companies sell insurance doesn't mean they're in competition. My client didn't want litigation. My client spent 25 years doing fine and not having actual confusion and not being harmed. Once the defendant started encroaching on that particular territory, that's when my client said, hey, we need to do something about this. In 2014 and 2015, the parties corresponded, and my client's lawyers sent letters that said, hey, you're expanding now into direct marketing, and that's going to be a problem. Now, the district court found that my client was aware of the likelihood of confusion since 1995, but that was just a letter from the defendant saying, hey, there's a likelihood of confusion. That wasn't my client. My client waited until there was actionable, I mean, 67 instances of actual confusion. Counsel, I think that's my primary question in this case is the analysis of the district court with regard to the likelihood of confusion and specifically with regard to the progressive encroachment issue. I think you've alleged that the district court resolved disputed facts improperly in favor of international. Could you address that, and what facts do you claim were improperly resolved? Yes, Your Honor, that is what we claim, and specifically, the district court found that the defendant, AIG, had competed and sold insurance direct to consumers for many years prior and didn't stop using the mark. If you look at the evidence we've cited and we set forth on pages 7 and 7, I'm sorry, 8, 9, and 10 of our reply brief, there's specific evidence we submitted testimony from the defendant that said, yes, we were using AIG direct. We stopped using AIG direct. We were selling life insurance direct to consumers, but it was under a mark called matrix. In 2011, 2012, we submitted testimony to the district court, and it's on pages 8, 17, 58, and 8, 17, 59 of the record, where the CEO of those units in 2011 and 12 said, we're now going to switch back to AIG. Counsel, let me interrupt because my concern is the same as Judge Graza's, and I want to get a little more specific, and in applying the Rotary case, which you rely on heavily and opposing counsel doesn't even attempt to comment in the brief. What is the test with respect to the mark owner's perception of likelihood of confusion? Is that test, what is the product scope of that? In other words, the likelihood of confusion, how do you address that when you've got an insurer competing, well, maybe not even competing, but insurers at two levels selling multiple products in multiple markets? What evidence was presented on that, and what's the law? Well, the law is on the likelihood of confusion analysis, I think there's two, well, there's three factors that are directly applicable. One is the similarity of the marks. Nobody disputes they're both AIG. There's two others. One is the fields of use and the sophistication of the consumer. So obviously, if you're selling insurance to brokers who in turn sell it to consumers, there's a difference than selling direct to consumers. But the most important one, Your Honor, is instances of actual confusion. It's not necessary, but it's arguably the best evidence of a likelihood of confusion. And for 25 years, there's no evidence in the record of actual confusion. In fact, in the three times that the defendant sent letters to my client saying stop, they never alleged that. Wait, wait, wait, wait, wait a minute. Rotary talks about the requirement for the need to analyze when should the mark owner have perceived sufficient likelihood of confusion to bring a trademark suit before you? Because you're facing with you're faced with the risk of suing too soon and losing relief or not suing soon enough and losing the mark. So this is a this is not just evidence of actual confusion. This test requires much more subtle evidence than that. And what's in the record? Well, Your Honor, I would respectfully disagree with respect to the actual confusion. My client. Oh, sure. Sure. Evidence, evidence of actual confusion would be relevant. But it but it doesn't say it doesn't answer this. This essential trigger question for latches. I would say it's an objective belief, objective assessment of the evidence where the plaintiff should assess real harm because a small business like this doesn't want to. But OK, so now now let's OK, let's what executive affidavit or deposition testimony from a agency do I read to see that you presented a trial issue? Well, what is it? What executive said? We were ready to enforce our mark, but we decided not to do it because because there wasn't enough confusion out there. Well, Greg, where he testified to that, he said there was absolutely hardly any confusion prior. And then once they shut down his Web site, his GoDaddy Web site improperly in 2015, 16, and he complained about that. And that's in the record. So AIG, the defendant shut down his Web site improperly and then withdrew that and allowed him to come back. And he was repeatedly getting increasing calls from his clients and from other clients who weren't his clients complaining that thinking that he was AIG. And he testified that once this all this flood of confusion came in, he realized that his business was truly being harmed. And your honor, I think. And why did why didn't he sue them? Well, he did, your honor. He sued with it. Wait, wait, wait. I thought there was years of that. That was in 2011, wasn't it? No, no, no. That's when they first they first came back into the market in 2011. They didn't sell direct life insurance to direct mail to consumers until 2016. But in the record at pages 2015, I'm sorry, in 2014 and 2015, there was correspondence between the parties. And in the appendix at page a 2084 and a 2086, my client's prior attorneys sent a letter that said your client's use of AIG. I asked you when when was this GoDaddy incident or I said wasn't that I was focusing on the date of that. There are all kinds of reasons, not all kinds of reasons not to sue. But for latches, the essential thing under Rotary is not suing because there wasn't a sufficient basis to conclude likelihood of confusion. And you say, well, it was when they when they when they shut down the GoDaddy website. That was the key. And so I said, what was that? I'm sorry, I misunderstood. It was in 2014. They shut down the GoDaddy website. And when was the suit? I believe it was 2017, your honor. And the reason for the delay is there was correspondence between the parties where my client was yet still trying to work out the dispute. And that's what I was reading to you in that letter. As a result of that, you know, they didn't want to jump into litigation. They sent a letter and that's where the. So your your position is your position as for latches purposes, if Rotary if under Rotary 2014 should be the the key date or somewhat or somewhat earlier, somewhat earlier. Probably probably 13, 14, your honor, 2013, 14, when that when the instances of actual confusion started to ramp up. OK, thank you. And I see I'm into my rebuttal time. So unless there's other questions, I'll reserve the rest. Your honor, I may please the court. Zachary Tripp for AIG, the multinational, I'll call us AIG and call them the agency for clarity. To answer a couple of the questions in their in their complaints in the appendix at twenty three and twenty four. As you may know, I want to I want to hear your answer, your response to the Rotary position, which you which I mean, they cited it all over the place in the in the brief. And you had one reference which just acknowledged they were citing it. Why doesn't it apply here? I think the district court handled this just right. The progressive encroachment, as Rotary explains, the question is not the district. Did the district court say Rotary? I didn't look at that. I believe so. Yes. I didn't I didn't see much. I didn't see much of the analysis because because what the district court explained is under under progressive encroachment. It's not when you know about the abstract use of the markets. Council, wait a minute. I want to get at Rotary. Yeah, I want to know what's your bet. What is your best evidence of 3000 free 2012 infringement that was not de minimis as to AIG agency? OK, that was the first that was the first circuit test in Oriental. And it's basically the it's basically the Rotary test. So I don't think I don't think I don't think the district court addressed that at all. If I could list a few. So one is it's undisputed that 70 percent of their business for the entire time running back to 1984, their CEO testified was selling commercial policies to businesses. Undisputed AIG has been doing that the entire time. They make a lot of noise about it. It's got to be in their local market and in their local market. OK, I asked you, where do I go on the record for the analysis of an issue that I don't think was analyzed properly or the analysis by the district court is not clear to me. I think the key spot in the record and really one of the most damning documents in the record is the 1995 communications between the parties. Their response to us on page 1553 of the record. Right. So we sent them a demand letter telling them to stop the use of the mark in in and around St. Louis. Right. That's that's the demand because of the likelihood of confusion, the overlapping use of the mark. And in their response to us, they don't dispute the likelihood of confusion. They don't say, you know, we're in different lines of business. I don't know what you're talking about. Their response instead is that they say they're there first. Right. That's all in the briefs. Mike Rotor at five, not sixty nine, eight, sixty to sixty one. As I read it, the Eighth Circuit says. That's controlling law, whether it's a holding or not, is always debatable. Progressive encroachment triggers latches when the likelihood of confusion is sufficient that the market owner should know that the claim is actionable. The 1995 correspondence doesn't do that for me. And if you if you apply Rotor literally, the district court has to decide on under summary judgment, has to decide that question under summary judgment standards. And that to me is the big the big problem with this. Can this appeal? I think, frankly, on the summary judgment, I think, you know, I'm all for that. Right. I think that what the plaintiffs have here is a lot of allegations. But the record is voluminous. I mean, summary. I mean, summary judgment for you, not for them. No, I know. But even they wouldn't they wouldn't get it on appeal. It is undisputed that we've we've both been in the market in in St. Louis in and around Missouri. I mean, we've been operating nationwide since 1968. And there's been communications between the two sides back to 1984. Yeah. Through them in part. Back and forth. And then this continuing exchange of letters. They admit in their brief on appeal on page five that we were selling auto insurance directly to consumers even before. But even before the crash. But all this focus, again, on direct to consumer. I guess a couple of points. This is their claim. They didn't put in any evidence, any consumer survey or something like that. Trying to show that there were different perceptions of the mark, trying to slice and dice it. This is not narrowly. And I think a piece of it is because actually their claim is they're trying to get to stop using the name nationwide. And so they didn't try to slice and dice and say, we want you to stop using it in direct to consumer mailings in Missouri or something. This is this is a much, much broader claim. And the district court analyzed the claim that was was put in front of it. And I think really quite properly, 70 percent of their business, right, is selling is selling commercial insurance to businesses. And the crux of the communications, open and notorious communications between the two parties is about the overlapping use of the mark and the potential for confusion. And so the notion that they weren't on notice, that somebody might be confused about two different parties selling insurance under the name AIG in the same markets, I think just really can't be squared with the record is actually in front of the court. I think I have the same concern as Judge Loken, and maybe I could explain it this way. Seems to me the issue here is I hear language about notice or awareness of risk or cognizance of risk. The district court said the agency had been cognizant of the risk since 1995. Your brief opens by arguing that they have actual knowledge of AIG's use of the mark. But that's not the standard. The standard is whether there's so much evidence that they've got an actionable, actionable and provable claim. So that that's what I'd like to address. I guess maybe maybe one other piece of this that I think is telling on this exact issue. If you look at their first response to us in 1995, they invoke latches. Right. They say that our claim might already be to 10 years too late because we've both known about the overlapping use since at least 1984, if not earlier. And so I think we're really talking about many, many decades of delay and periods in which AIG has spent hundreds of millions of dollars building and rebuilding its brand is one of the best known insurance companies in the world. And so I think, you know, as the district court put it, it would be a grave dislocation indeed to pull the rug out from under AIG at this late date after you have this coupling. I think it's really three things. You know, it was facing a superior user in a local market. So buy them off. That's that's what people with later, later registered marks worth hundreds of millions of dollars in the world market. That's what you do. That's the real that's real life. And your client consciously chose not to do that. And they consciously chose never to tell us to stop. They never threatened us. They never said that they would sue. They said the opposite. They said that they were not litigious by nature and were content with maintaining the status quo. They were a customer in part. And they're still there. Greg Wary is still actually registered to sell AIG insurance, as I understand it. OK, but they have a priority common law, a superior common law market in a small area that had to be respected under the common law. But what they can't, I think, is that the whole thing is your client's right. Lanham Act rights from a red being registered. No, but what they what they can't do, and I think really the heart of the latches doctrine, right, is after this issue was put in front of them in communications, certainly by 1995. Right. In those letters. And I think, frankly, quite a bit before that. And what you what you can't do under latches is sit back and wait and watch the other side succeed for years and years and years and investing and building its brand before coming out with this this extraordinary demand that they need to rename themselves nationwide. Right. And I guess one other thing is, you know. Well, you know, that's a that's a that's a defense on a lot on the merits that a lot of levels in this case. But but you you went you went for latches, the 500 pound gorilla, which means you had to prove the rotor that the rotor test and other equitable, equitable principles gave you the right to throw that throw their common law market into the ditch. But where I guess what it may be one important point, we're not asking them to stop. We're not telling them to stop using their mark locally. They can do that. That was your that was your counterclaim. We have drawn. Now you want to defend the voluntary dismissal. We have dropped the counterclaim, Your Honor. And the only thing that's that's an issue on appeal. That's the cross appeal. Whether whether the dismissal should be with prejudice or without prejudice. That's an issue. But but we're not we're not trying to force them to stop doing business in in and around St. Louis. The claim is the other way around. They've come after us with a demand in their complaint, asking us to drop the name telling us we need to pick a name other than after. This is not this is not unusual. In my view, we have we have sophisticated lawyers who overreach on behalf of both clients. And we have to we have to figure out what to do with that. I think respectfully, Your Honor, we're on. This is a situation where the district court went through the evidence that was presented and the claims that were put on. I think the opinion is very thoughtful and very careful assessment of what is really a very lopsided record where there's been knowledge and discussion and acquiescence going back for decades and decades. And that really is the heart of the latches doctrine is that there's a point where the more senior, the more allegedly more junior user is secure in its rights and it can continue. It can go about its business. And so what you can't do, as you just said, you just said you just said the more senior user. The the allegedly that's not your client. That's not your client. If I'm sorry, I'm sorry, Your Honor. If I did, I misspoke. I was saying the allegedly more junior user. So here is secure in its rights and we can go about its business. This is what the learned hand decision that the district court discussed on this issue was really all about. It's about this kind of lying in wait and watching your the allegedly more junior user invest in its business, build it into a well-known nationwide here worldwide brand before coming out with this kind of extraordinary demand. Another thing that they never put in. Right. I think in part because they're asking for the nationwide change. They never put in any evidence that some kind of narrow relief would even be feasible, would even help, would be any less prejudicial. It would be extraordinarily disruptive to try to have some kind of injunction saying that needs to have a two track to do two different brand strategies. And again, I think some really critical evidence in the record, their CEO admitting that 70% of their business is selling commercial insurance to businesses. Their admission in their brief on appeal that we were selling direct to consumer auto before. Another thing you might want to look at. We've been selling personalized insurance for decades. It's uncontroverted. We have a promotional brochure in the record. There's about 100 pages of advertising in the record. We have a promotional brochure from 1984 with all these personal lines, a whole section of personal lines of insurance that we sell auto insurance, homeowners insurance, life insurance. And so the notion that the parties were in different markets, I think it is really just that there is no support for that. And actually, the record refutes it. Right. The communications between the parties are specifically about use in and around St. Louis. That's what prompted the communications was AIG, my client, learning about their use of the mark in and around St. Louis. It was the likelihood of confusion then that prompted it. It was their recognition. Mr. Tripp, looking at the record, we could find very few advertisements targeted to consumers directly between 2009 and 2012. Can you point to some specific advertisements from that time period that demonstrates the use of the AIG mark to directly directly to consumers? Directly to consumers advertising. I don't. There is a direct consumer ad from 2018 involving a Penn State basketball player. They admit that we picked up with AIG life again in 2011. That's in paragraph 18 of the summary judgment, the material facts points. But I mean, on abandonment, that is an incredibly high standard. Right. You're talking about stripping intellectual property rights, sending them back to the public domain. They need clear and convincing evidence that we stopped, not just not just a gap. And the district court actually marched through the evidence that shows. Actually, we were continuing to use it the entire time. The record has traffic data from our websites showing tens of thousands of hits generating millions of dollars annually. There's deposition testimony at a 480, a 499 to 500 with AIG witnesses saying that they had not stopped and not stopped advertising. There's deposition testimony about the private client group, which was always operating direct to consumer. And so on all of this, right, they have put forth a lot of allegations. But what they don't have is evidence. And the record evidence is actually very squarely against them. The district court here did an incredibly careful job marching through a one sided record. And I think especially at this point. Last question, counsel, who has the burden of proof on latches? On on on latches, we are the ones who raise the latches defense. But this is my who has the burden of proof. I believe we do. It's an equitable defense. What do you say? Nonetheless, the plaintiff has the burden. But there are the ones who are trying to prove abandonment. And I think the district talking about abandonment.  OK, I'm sorry. I'm sorry, Your Honor. But on you, you inserted the abandonment. All our questions have been about the defense. And I think who has the burden of proof? And then we're done. On that, the record evidence on summary judgment. This is not about equity. I didn't ask you about that. I asked you a simple. I remember us. Who has the burden of proof of persuasion? They have the burden of persuasion on their entire claim. We raised latches. We have the burden on that. They have raised. They have tried to raise an excuse. You won't answer a question. You're done. I'm sorry, Your Honor. I thought I was answering your question. No, I asked you who had who has the burden of persuasion on your equity, your affirmative, equitable defense. Under under applicable federal or Missouri law. I believe we have the burden on our affirmative defense. But they are trying. They are raising this. This excuse and the record for. Thank you. We're done. Thank you. We have a long morning. Jason has been thoroughly great. It's. Oh, I'm sorry. It's a rebuttal time. My mistake. Excuse me. I'm sorry, Your Honor. I just wanted to make two points. One of the things he just said was that their private client group was direct to consumers and the record at a twenty one thirty three and thirty four. Miss Carstein was their corporate representative testified quote she believed the private client group is through independent brokers, not the direct to consumers. That's the kind of evidence we have in the case. That's what we submitted. I took that deposition myself with respect to this abandonment argument. Our point on abandonment is simply that if a company that the judge found that they'd be prejudiced if if they had to stop using the mark and and. Oh, wait, wait, counsel. You didn't you didn't argue abandonment in your initial. And as I just pointed out, only counsel didn't attempted to argue it, but we didn't let him. So that's off. That's off limits for rebuttal. Very good, Your Honor. With respect to prejudice, the other actually what I'll say is this. This is a is a classic case of a dilemma of a junior, a senior user trademark owner in a limited geographic area trying to determine when it should move forward with litigation. My client lost this case because it didn't want to jump into litigation too soon, and it waited until it was really being harmed before it took action. We submit that the district court did not assess the actual evidence. And if you look at the actual record, which should be reviewed de novo on appeal, the factual disputes that it's clear that there were factual disputes that presented summary judgments unless there are more questions. That's all I have. Thank you, Counsel. The case has been thoroughly briefed and argument has been helpful. It's complex and we'll take it under advisement.